**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name:  06a0015n.06**
**Filed:  January 6, 2006**

**No. 03-6515**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| OMNICARE, INC., | ) ) | |
| Defendant-Appellee. | ) | |

Before:  BATCHELDER and DAUGHTREY, Circuit Judges; O'KELLEY,[*] District Judge.

PER CURIAM.  Litigation in this diversity action for breach of contract was initiated when plaintiff International Business Machines Corporation, universally known as IBM, sued defendant Omnicare, Inc., for non-payment of over $3 million under several contracts that were unrelated to the ones at issue in this appeal.  Omnicare did not contest its liability for that amount but responded with a counter-claim alleging that IBM had breached a separate set of contracts, the ones that are at issue here, and therefore owed Omnicare a full refund of the $6 million that Omnicare had paid IBM under the latter contracts.  Following a bench trial, the district court found IBM liable for breach of contract and

---

[*]The Hon. William C. O'Kelley, United States District Judge for the Northern District of Georgia, sitting by designation.

apportioned 65 percent of Omnicare's resulting losses to IBM, ordering IBM to refund that amount to Omnicare, offset by the uncontested sum that Omnicare owed IBM under the set of unrelated contracts. The court also held that IBM was not entitled to prejudgment interest on the $3 million owed by Omnicare, because of the existence of the offset.

IBM now appeals the district court's determination of liability, the calculation of the amount of damages, the factual finding concerning a payment made to IBM by Omnicare, and the denial of prejudgment interest. Because we conclude that Omnicare's claims are barred as a matter of law, we reverse the judgment of the district court and enter judgment in favor of IBM.

## **FACTS AND PROCEDURAL HISTORY**

At the time of the events that gave rise to this litigation, Omnicare was the nation's largest provider of pharmacy services to long-term care facilities. In 1993, Omnicare created a proprietary pharmaceutical-dispensing software program called OASIS. After experiencing significant difficulty converting its various pharmacies to the OASIS program, Omnicare solicited proposals from two consulting firms, IBM and EDS, for streamlining the conversion process. On June 8, 1998, Omnicare awarded the contract to IBM, and on June 19, 1998, Omnicare signed IBM's standard "agreement for services." That contract was subsequently replaced by an updated agreement for services signed on November 30, 1998.

IBM's proposal consisted of a two-phased project that included a three-month assessment followed by a 15-month implementation. The first phase was codified in a "statement of work" signed by the parties on June 19, 1998. This agreement was a fixed-price contract that required IBM to develop a proposal for executing the OASIS conversion for all 140 Omnicare pharmacies. For this service, Omnicare paid $985,800.00 to IBM. The performance and payment of phase one are not contested in this appeal. Although IBM's original proposal anticipated a similar fixed-price contract for phase two, IBM later realized that such an arrangement was not feasible. Instead of moving into phase two, IBM proposed that they conduct a "pilot phase" in which IBM's recommendations for rapid deployment would be tested by running pilot deployments at three sample pharmacies. The pilot phase agreement is the principal subject of this appeal.

The parties had difficulty negotiating the statement of work for the pilot phase; on October 1, 1998, the parties signed a letter agreement authorizing IBM employees to begin work while the parties continued negotiating the formal contract. The letter agreement was extended twice, once in February and once in November, before the final statement of work was executed on December 15, 1998. This agreement was not a fixed-price contract as the parties had originally envisioned, but rather a time-and-materials contract under which Omnicare bore all liability for the results of the project. The relevant portions of the contract read:

> IBM will provide Omnicare with IBM consulting and technical resources for the period from October 1, 1998 through March 12, 1999 . . . . These

> resources will assist with the Omnicare OASIS data conversion and deployment activities.
>
> . . . . .
>
> Omnicare will coordinate task assignments of IBM through the representative designated by IBM. Omnicare is responsible for all results achieved utilizing the services performed by IBM. The hours authorized by you and specified below do not imply or commit a fixed price contract. IBM is solely responsible for providing hourly services under this Statement of Work.

The district court expressly found that the agreement was made in good faith and in the absence of fraud, and that portion of the court's decision is not contested on appeal.

The final statement of work provided for termination upon three weeks notice. The contract also implied that statement of work was provisional, stating that "[t]his [Statement of Work (SOW)] shall be superceded by the definitive SOW currently under negotiation by Omnicare and IBM upon execution of the definitive SOW." The referenced "definitive SOW" was never signed or executed by the parties, but the parties did execute several subsequent "project change requests" that modified the December 15 contract. Omnicare extended IBM's services under the statement of work on two separate occasions, once in February 1999 and again in May 1999. The May project change request extended the contract for eight more months and approved $5 million in additional services. Had the statement of work not been extended, IBM's services on the pilot phase project would have automatically terminated on March 12, 1999.

Shortly after the pilot phase began on October 1, 1998, IBM began experiencing unusually high turnover in its project staff. As the district court stated in its findings of fact:

> IBM had severe problems in attracting and retaining personnel to work on the OASIS conversion teams at the pharmacy sites. Several of the key personnel that IBM had trained for the project resigned or were terminated. . . . IBM also could not retain what staff it could attract. Less than three months into the Pilot Phase, both IBM and Omnicare began to have serious concerns about the retention of IBM consultants on the project.

IBM's personnel problems were highlighted in a December 21, 1998, internal IBM e-mail in which project executive Marilyn Kneafsey wrote, "The customer has paid us millions of dollars, literally, and the people that they have invested so much in training are dropping like flies." Kneafsey continued, "I think we are looking at the potential for a large (legitimate in my opinion) customer concession request pretty soon." Similarly, on December 10, 1998, an IBM account manager noted in a status report that replacements "can't come fast enough."

Of the personnel that IBM was able to retain, several failed to perform up to expectations, and IBM fired two support analysts in May 1999 for substandard work. At trial, Omnicare account manager Ken Krusling testified as to the poor performance of two different IBM account managers. Krusling testified that both managers were overwhelmed and incapable of doing their jobs. The district court found that:

> The Account Managers that IBM was able to retain were not prepared to manage the conversion meetings with the conversion teams and pharmacy staff. They had not become adequately familiar with the OASIS system to provide guidance in the data conversion.

In spite of these problems, Omnicare executive Michael Laney responded favorably to questioning for IBM's project management review report solicited by IBM's quality assurance department in February 1999 that was intended to assess client satisfaction survey independently from the IBM personnel working on the pilot phase. The report noted that "customer sat[isfaction] is average to good." In reference to the survey, Laney later testified that he "felt things were going pretty well at that time" and "didn't have any serious concerns." Throughout the duration of the contract, Omnicare continued to sign off on payments for IBM and ultimately paid approximately $6 million for the pilot phase OASIS project.

In the meantime, however, Omnicare was experiencing a downturn in its financial fortunes. Over the course of the summer in 1999, the company's stock plummeted from approximately $40 a share to less than $10 a share. In order to stay afloat, Omnicare cut $46 million from the company's operating expenses and laid off almost a thousand workers. Moreover, in July 1999, Omnicare verbally informed IBM that it would be terminating the pilot phase agreement. The termination was executed through a project change request signed on August 5, 1999. On September 22, 1999, Omnicare executive Laney sent IBM a formal termination letter, in which, significantly, Laney did not express or imply any criticism of IBM.

In August 1999, Omnicare ceased to make payments on all of its IBM contracts, including the OASIS pilot project and several unrelated contracts. IBM filed suit against

Omnicare in April 2000, seeking to obtain over $3 million that it was owed on the non-OASIS contracts, plus prejudgment interest. Along with its answer conceding liability on those contracts only, Omnicare filed a counterclaim alleging that IBM breached the contract for the OASIS pilot project and demanding a full refund of all moneys paid to IBM under that contract. Omnicare did not allege that IBM breached any of the other OASIS contracts.

Based on diversity of citizenship, IBM filed its complaint in Kentucky, where Omnicare has its principal place of business, but alleged liability under New York law, as provided in the contract. Following a bench trial, the district court ruled that IBM had breached the pilot phase agreement, finding that IBM was 65 percent liable for losses experienced by Omnicare under the pilot project, while Omnicare bore the remaining 35 percent responsibility. Accordingly, the court ordered IBM to refund 65 percent of the money it had received under the OASIS contracts, to be offset by the amount Omnicare owed to IBM under the non-OASIS contracts.[1]

IBM now appeals the district court's finding that IBM breached the pilot phase OASIS contract with Omnicare. IBM further challenges the district judge's determination that

---

[1]The parties stipulated that Omnicare owed IBM a total of $3,078,655.84 on the uncontested, non-OASIS contracts. When the parties could not reach agreement on the remaining issues, the district judge referred the matter to the magistrate judge to determine the amount of the award. The magistrate judge found that Omnicare had paid IBM a total of $6,020,666.98 for the pilot phase services. Omnicare was thus entitled to a 65 percent rebate of that sum, which came to $3,913,433.54. After being off-set against the amount that Omnicare owed IBM, Omnicare's final award was $834,777.70. Although IBM argued that Omnicare owed it an additional $1,309,046.67 in prejudgment interest on Omnicare's uncontested debt, the magistrate judge found that IBM was not entitled to prejudgment interest, based on the necessity of the setoff.

Omnicare was entitled to a refund, that Omnicare had adequately established the amount already paid to IBM, and that IBM was not entitled to prejudgment interest.

**DISCUSSION**

On appeal, we review the district court's findings of fact for clear error and its conclusions of law *de novo. See Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 355 F.3d 574, 589 (6th Cir. 2004). Mixed questions of fact or law must also be reviewed *de novo*, although the district court's determination of underlying facts is subject only to clear error review. *Sandler v. All Acquisition Corp., Inc.*, 954 F.2d 382, 385 (6th Cir. 1992). A finding of fact is clearly erroneous only when "the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 341 (6th Cir. 1997). The parties have stipulated that the contract claims are controlled by New York law.

As a threshold matter, IBM identifies two bases that allegedly raise a legal bar to Omnicare's recovery for breach of contract: violation of the cure provision and waiver of the right to claim breach. Both grounds raise mixed questions of fact and law, to be reviewed *de novo.* According to IBM, in the event of a purported breach, § 1.6.6 of the "agreement for services" requires that the party in compliance must give notice to other party and allow time to cure before claiming breach. But, perhaps due to poor drafting, that section provides only that each party "will allow the other reasonable opportunity to comply before it claims that the other has not met its obligations" and does not clearly require the parties

to give actual notice of breach. In testimony at the bench trial, an Omnicare executive testified that Omnicare failed to terminate the contract sooner because it continued to hope that IBM would be able to pull through and meet its obligations. In other words, according to its interpretation of § 1.6.6, Omnicare gave IBM a "reasonable opportunity" to comply.

We agree with Omnicare that the provision in § 1.6.6 is ambiguous. It could mean that a party may not terminate at the first sign of breach, but rather should give the other party time to get back on track. In any event, the section does not explicitly require that notice of breach must be given. Although in interpreting a contract we must give the "full meaning and effect" to all its provisions, where the meaning is not clear, we are constrained to construe ambiguous language against the party that drafted it. *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2nd Cir. 1996). Because the language of § 1.6.6 is unclear, the provision must be interpreted against IBM, as drafter of the contract.

IBM is on more solid ground in arguing that Omnicare waived its right to claim breach by affirming IBM's performance and failing to give notice of breach. Omnicare responds by contending that under New York law, when one party breaches, the complying party can either "terminate the parties' contract and claim damages for total breach . . . [or] continue the contract and sue for partial breach." *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 383, 389 (S.D.N.Y. 1999) (citations omitted). Omnicare has failed to note, however, the other cases that clarify this proposition. Those cases hold, for example, that "where a party to an agreement has actual knowledge of a breach, but elects

to continue performance, that party waives the right to sue the breaching party unless timely notice of the breach was provided to the breaching party." *AM Cosmetics, Inc. v. Solomon*, 67 F. Supp. 2d 312, 317-18 (S.D.N.Y. 1999); *see also Nat'l Westminster Bank v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991) (a party may continue to perform and later sue for breach "only where notice of the breach has been given to the other side"). Moreover, a party to an agreement "can indicate that he has chosen to continue the contract by continuing to perform under the contract or by accepting the performance of the breaching party." *Bigda v. Fischbach Corp.* 898 F.Supp. 1004, 1011 (S.D.N.Y. 1995). By continuing to pay IBM and by agreeing to extend IBM's services several times during the period of the alleged breach, Omnicare clearly indicated its choice to continue the contract, despite IBM's admitted difficulties in performance that Omnicare later characterized as a total failure to perform. Furthermore, Omnicare had "actual knowledge" of the alleged breach and failed to reserve its right to sue by giving IBM notice.

Indeed, Omnicare admitted at trial that it knew about IBM's alleged failure to perform and, hence, there can be no dispute that the record establishes "actual knowledge." Even in its termination letter to IBM, Omnicare did not suggest that IBM was in breach of its obligations under the contracts. In fact, the company did not allege breach until after IBM brought a suit for payment of funds admittedly due and owing. In the absence of a district court finding to the contrary, we conclude that IBM has established waiver and that, because Omnicare knowingly chose to affirm the contract and continue accepting the benefit of IBM's services, it could not belatedly demand a refund from IBM for the services

IBM performed. *See ARP Films, Inc. v. Marvel Entm't Group, Inc.*, 952 F.2d 643, 649 (2nd Cir. 1991) (where a party elected to affirm contract in the face of breach, that party cannot not refuse to perform its end of the bargain); *Bigda*, 898 F.Supp. at 1011 (plaintiff could not claim breach of contract after he elected to continue his contract in the face of the breaches that had occurred); *Nat'l Westminster Bank*, 130 B.R. at 675 ("where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach.").

Because we find that Omnicare cannot pursue its counterclaim against IBM as a matter of law, we need not address issues raised by IBM concerning the district court's calculation of damages for breach of the OASIS project contract. Moreover, we find no basis on which to reverse the district court's determination that Omnicare had made a payment to IBM in October 1998 totaling $365,329.66, given nothing in the record to suggest that this finding was clearly erroneous.

The case must be remanded, however, on the question of prejudgment interest on Omnicare's surviving $3 million liability to IBM. The district court's determination that IBM was not entitled to an award of prejudgment interest would normally be reviewed for abuse of discretion. *See Anderson v. Whittaker Corp.*, 894 F.2d 804, 809 (6th Cir. 1990). In this case, however, the denial rested on a conclusion of law that the existence of a setoff precluded an award of prejudgment interest. Because a setoff is no longer involved in the

resolution of this dispute, and because the amount owed to IBM on its original claim constitutes liquidated damages, "[prejudgment] interest follows as a matter of right." *Hale v. Life Ins. Co.,* 795 F.2d 22, 24 (6th Cir. 1986).

## CONCLUSION

Because Omnicare's counterclaims are barred as a matter of law, we find it necessary to REVERSE the district court's judgment in favor of Omnicare and VACATE the order of setoff. The case is REMANDED to the district court for entry of judgment in favor of IBM, including an award of prejudgment interest.