RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0187p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

GIANT EAGLE, INC., et al.,

　　　　　　　*Appellants/Cross-Appellees,*

　　　　*v.*

　　　　　　　　　　　　　　　　　Nos. 06-4142/4188

PHAR-MOR, INC.,

　　　　　　　*Appellee/Cross-Appellant.*

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 06-00432—David D. Dowd, Jr., District Judge.

Argued: February 8, 2008

Decided and Filed: May 19, 2008

Before: NORRIS, BATCHELDER, and GIBBONS, Circuit Judges.

———————————

**COUNSEL**

———————————

**ARGUED:** Darlene M. Nowak, MARCUS & SHAPIRA, LLP, Pittsburgh, Pennsylvania, for Appellants. Michael A. Gallo, NADLER, NADLER & BURDMAN, CO., L.P.A., Youngstown, Ohio, for Appellee. **ON BRIEF:** Darlene M. Nowak, MARCUS & SHAPIRA, LLP, Pittsburgh, Pennsylvania, for Appellants. Michael A. Gallo, NADLER, NADLER & BURDMAN, CO., L.P.A., Youngstown, Ohio, for Appellee.

———————————

**OPINION**

———————————

　　　ALICE M. BATCHELDER, Circuit Judge. This is an appeal from the district court's review of a bankruptcy-court order in a Chapter 11 proceeding. Giant Eagle, as lessor, appeals the decision disallowing its claim for future-rent damages arising from a bankrupt lessee's rejection of a lease for personal property, which was disallowed on the basis that a substitute lease for that property, if fulfilled, would have mitigated the claimed damages. Phar-Mor, as lessee, appeals the decision granting the lessor administrative expenses in the form of post-petition rent payments, from the petition date until the lease-rejection date. Ultimately, we REVERSE with respect to the disallowance of future rent and REMAND to the district court, for further remand to the bankruptcy court for further proceedings. We AFFIRM the order granting as an administrative expense the post-petition rent due for the period from the petition date until the rejection of the lease.

**I.**

On May 1, 1995, Phar-Mor, Inc. signed leases with Giant Eagle, Inc. and Valu Eagle Associates, whereby Phar-Mor would pay $44,496.45 per month and $1,832.46 per month for the use of certain warehouse equipment owned by Giant Eagle and Valu Eagle, respectively.[1]   This warehouse equipment included shelving, conveyor belt systems, lift trucks, batteries, and specialized racking and selection equipment used in moving and selecting inventory.  Both leases had the same 160-month term, which meant that they were scheduled to terminate on September 1, 2008.

On September 24, 2001, Phar-Mor filed for bankruptcy.  For the next several months — until July 17, 2002 — Phar-Mor continued to use the warehouse equipment to count, document, and dispose of the inventory it had remaining in the warehouse, and continued to pay at least partial rent during that time.  On July 18, 2002, the bankruptcy court entered an order authorizing the sale of substantially all of Phar-Mor's assets, which led to final inventory counts and liquidation sales.  On September 30, 2002, Phar-Mor formally rejected the equipment leases.  Giant Eagle claimed administrative expenses, based on the rents due on the leases during that time:

| | |
|---|---|
| Giant Eagle Lease: | |
| September 24, 2001 to July 17, 2002: | $    96,375.72 |
| July 18, 2002 to September 30, 2002: | $  109,088.07 |
| Valu Eagle Lease | |
| September 24, 2001 to July 17, 2002: | $      4,597.59 |
| July 18, 2002 to September 30, 2002: | $      4,492.48 |
| Total Administrative Expense (past due rent): | $  214,553.86 |

Also, pursuant to the leases, Phar-Mor's rejection (i.e., breach) obligated it to pay liquidated damages equal to the present value of all future monthly payments outstanding, calculated based on a seven percent (7%) discount rate.  As of September 30, 2002, there were 71 monthly payments remaining on each lease and the present value of those payments was calculated at $2,580,642.60 and $106,276.44, for the Giant Eagle and Valu Eagle leases, respectively.

On October 31, 2002, Giant Eagle — acting under a duty to mitigate the damages resulting from Phar-Mor's breaches of the leases — signed substitute leases with Snyder Drugstores, Inc., whereby Snyder would pay the same rent that Phar-Mor had previously agreed to pay, for the use of the same warehouse equipment.  Although these new leases covered the same equipment for the same price, these leases were separate from and independent of the prior lease agreements between Giant Eagle and Phar-Mor — there was no assignment, assumption, release, novation, or waiver of Phar-Mor's leases.  These leases also had a duration and termination date different from the original Phar-Mor leases.

The new leases with Snyder were for 120 months — i.e., until October 31, 2012.  But, on September 11, 2003, Snyder filed bankruptcy, and on November 30, 2003, after using the equipment for just a little over one year, Snyder formally rejected the leases.  Snyder paid overdue rent, from October 2002 to November 2003, as administrative expenses, totaling $622,950.30 and $25,654.44, on the Giant Eagle and Valu Eagle leases, respectively. In addition, based on the determination from Snyder's bankruptcy proceeding that unsecured creditors would receive six percent (6%) of the value of their unsecured claims, Snyder paid Giant Eagle six percent of the present value of the future rents:  $193,048.13 and $9,693.65, on the Giant Eagle and Valu Eagle leases, respectively.

---

[1]Throughout this opinion, we generally refer to appellants/cross-appellees Giant Eagle and Valu Eagle as "Giant Eagle" collectively, and refer to them individually only where it is necessary or appropriate for clarification purposes.

After Snyder rejected the leases, Giant Eagle was unable to lease the equipment to any other prospective lessees (it turns out, there were no other prospective lessees), so they chose to reuse some, sell some, and scrap the rest.[2]   Giant Eagle filed claims in Phar-Mor's bankruptcy proceeding,[3] requesting:  (1) administrative expenses in the form of rents due from September 24, 2001, until September 30, 2002, less the amounts Phar-Mor had already paid; and (2) liquidated damages for monthly lease payments due for the lease term remaining after September 30, 2002, less the amount mitigated (i.e., the amounts received from the Snyder leases and the subsequent sale/salvage of the equipment[4]).  Phar-Mor objected to these claims, but only in part.

Phar-Mor agreed that Giant Eagle was entitled to administrative expenses for the unpaid rents for the period from September 24, 2001, to July 17, 2002, during which Phar-Mor was using the equipment exclusively, and these values were not then, and are not now, in dispute.  But Phar-Mor objected to the claim for the period from July 18 to September 30, 2002, when — according to Phar-Mor — the equipment was being used for Giant Eagle's benefit.  Phar-Mor explained that, after the bankruptcy court ordered dissolution of its remaining assets on July 18, 2002, Phar-Mor used the warehouse equipment only to inventory the merchandise remaining in the warehouse and a significant portion of that merchandise was eventually sold to Giant Eagle at a deep discount.  Hence, Phar-Mor contends that the equipment was used for Giant Eagle's benefit.  Phar-Mor also contends that Giant Eagle had obtained the right to prevent Phar-Mor from accessing the warehouse or using the equipment, even though Giant Eagle had not actually exercised that right.

Phar-Mor agreed that Giant Eagle was entitled to liquidated damages resulting from the rejection of the leases for the period from September 30 until October 31, 2002, during which time Giant Eagle was indisputably suffering actual damages; but Phar-Mor objected to the claim for the period after October 31, 2002, when Giant Eagle entered into its new lease agreements with Snyder.

Thus, the disputed portion of Giant Eagle's claims can be summarized as follows:

|                                                  | Giant Eagle    | Valu Eagle    |
|--------------------------------------------------|----------------|---------------|
| Administrative Expenses:                         | 109,088.07     | 4,492.48      |
|                                                  |                |               |
| PV[5] of the Post-Rejection Lease Damages:       | 2,580,642.60   | 106,276.44    |
| Snyder mitigation (rent actually paid):          | (622,950.30)   | (25,654.44)   |
| PV of the re-used equipment:                     | (215,244.26)   | (8,864.43)    |
| Salvage sale proceeds:                           | (50,122.56)    | (2,088.44)    |
| Claim stated in Bankruptcy Ct. Opinion:          | 1,692,325.48   | 69,669.13     |

---

[2]Giant Eagle reported that it reused or reassigned approximately 10% of the equipment, and after estimating a value for that equipment, assigned $215,244.26 of that value to Giant Eagle and $8,864.43 to Valu Eagle.  Giant Eagle also recovered $52,211 from sale, scrap, and salvage of the equipment that was not reused and of that amount, assigned $50,122.56 to Giant Eagle and $2,088.44 to Valu Eagle.  Phar-Mor has never disputed these numbers.

[3]In the parties' joint stipulation of facts, the parties agreed that "Giant Eagle filed a timely proof of claim for damages arising from the September 30, 2002 rejection of the GE/PM lease," and "Valu Eagle filed a timely proof of claim for damages arising from the September 30, 2002 rejection of the VE/PM Lease."

[4]The bankruptcy court erroneously stated that Giant Eagle did not credit Phar-Mor with the money it recovered for re-use and salvage, but it is evident from the record that Giant Eagle did grant Phar-Mor this credit.

[5]"PV" refers to the present value of the monthly payments, based on 7% discount rate, as specified in the leases.

| | | |
|---|---|---|
| Snyder mitigation (breach damages): | (193,048.13) | (9,693.65) |
| Claim actually made to Bankr. Ct.:[6] | 1,499,277.35 | 59,975.48 |
| | | |
| Phar-Mor capitulation (rent - one month):[7] | (44,496.45) | (1,832.46) |
| Claim actually disputed: | 1,454,780.90 | 58,143.02 |

The parties stipulated to all of the pertinent facts and submitted the case to the bankruptcy court for a decision on their cross motions for summary judgment.

The bankruptcy court first addressed the "Post-Rejection Lease Damages" and agreed with Phar-Mor, concluding that Giant Eagle had fully mitigated its damages by re-leasing the warehouse equipment to Snyder. Therefore, the court concluded that Phar-Mor was not liable for any damages occurring after Giant Eagle obtained the replacement (mitigating) leases.[8] The court acknowledged that the Bankruptcy Code, 11 U.S.C. § 365(a), authorizes a debtor — subject to court approval — to "reject" an unexpired lease and treat it as though the debtor had breached it immediately before the petition date. *Id*. at § 365(g). Because the bankruptcy code does not address how to calculate damages for such a rejection/breach, *In re Highland Superstores, Inc.*, 154 F.3d 573, 579 (6th Cir. 1998), the bankruptcy court looks to state law, to the extent that it does not conflict with the bankruptcy code, *Butner v. United States*, 440 U.S. 48, 55 (1979). Pennsylvania provides the controlling law in this case, pursuant to the leases' express choice-of-law provisions.

Pennsylvania law provides a lessor on the receiving end of a lessee's breach with four possibilities for establishing damages, depending on the circumstances: (1) "[d]ispose of the goods and recover damages (§ 2A527)"; (2) "retain the goods and recover damages (§ 2A528)"; or (3) "in a proper case recover rent (§ 2A529)." 13 Pa. C.S.A. § 2A523(a)(5) (internal citation form altered). In addition, the lessor might: (4) "[e]xercise any other rights or pursue any other remedies provided in the lease contract" (e.g., seek liquidated damages). 13 Pa. C.S.A. § 2A523(a)(6). Regardless of the approach, the lessor has a duty to mitigate the damages and cannot claim damages that could reasonably have been avoided. *See In re Paskorz*, 284 B.R. 429, 431-32 (Bankr. W.D. Pa. 2002).

The bankruptcy court framed the argument as follows: "The parties' dispute over the amount of Lessors' rejection damages centers on whether Snyder's failure to fulfill the Snyder lease obligations revived Debtor's duty under [its] Leases." The court — professing an absence of any case law on this issue — deemed this a matter of timing and held:

> [O]nce a lessor mitigates its damages by re-letting the equipment, the lessor cannot claim damages from the debtor for the period covered by the new lease — even if subsequently the new lessee defaults in its obligations to the lessor. To hold otherwise would require the Court to attempt to forecast the viability of each lessee in a mitigating lease to determine if the mitigation will be 'successful.'

---

[6]At the conclusion of its "Facts" section, the bankruptcy court acknowledged, in a footnote, that Giant Eagle had amended its claim to further reduce the amount, based on money it had recovered from Snyder for its rejection of the replacement leases. Bankr. Op. 8 n.5. But, because its opinion was "nearly complete" when it received Giant Eagle's amended claim, and because it had determined that "the amended facts [] did not affect the allowance of the Claim" — the bankruptcy court did not update and correct the numbers it used in the text of the opinion.

[7]Although this one-month capitulation was not actually paid, it was allowed as a general unsecured claim (which is the status Giant Eagle seeks for the remainder of the claim) and is therefore no longer in dispute.

[8]Based on the outcome of its decision on this argument, the court declined to address Phar-Mor's alternative argument that Giant Eagle was judicially estopped from seeking post-rejection lease damages because it had previously filed proofs of claim for those same damages in the Snyder bankruptcy proceeding. Bankr. Op. at 17 n.9.

The court then criticized Giant Eagle, declaring that Giant Eagle "fully mitigated [its] damages under the [] Leases when [it] re-leased the equipment to Snyder," and Giant Eagle "made [its] own business decision in leasing to Snyder and must live with this choice."

The court proposed that if it "were to allow the subsequent breach of a mitigating lease to revive a debtor's obligations under the original lease," it would: (1) create uncertainty by forcing the breaching lessee to "wait anxiously" for the duration of its (rejected) lease term, because it would owe damages at some unknown (and unpredictable) time in the future, if the mitigating lease subsequently failed; (2) force the lessor to sue the original breaching lessee, even after mitigating, in order to protect itself against the specter of a failed mitigating lease and the expiration of the statute of limitations governing the original breach of lease; (3) render the breaching lessee a guarantor of, or co-debtor with, the subsequent mitigating lessee; and (4) put the lessor in a better position than it would be under the original lease, by allowing it to recover from both the original breaching lessee and subsequent (mitigatory) breaching lessee. The court allowed Giant Eagle a general unsecured claim for one month of rent (on both leases), to cover the time between Phar-Mor's September 30, 2002, rejection and Snyder's October 31, 2002, lease signing, but disallowed the remainder of the rejection-damages claim on the theory that Giant Eagle had mitigated.

The bankruptcy court next considered the "Pre-Rejection Administrative Rent Claims" and found in favor of Giant Eagle, concluding that, despite Phar-Mor's claims of inequity, the simple fact was that Phar-Mor — for whatever reason — had exercised its business judgment by choosing not to reject the equipment leases when it rejected the warehouse lease on July 18, 2002. Consequently, "[t]he equities of this case do not permit [Phar-Mor] to escape its duty to pay [Giant Eagle] for administrative rent from July 18, 2002 until the lease rejection date of September 30, 2002." The court awarded Giant Eagle these administrative expense claims.

Giant Eagle appealed to the district court, *see* 28 U.S.C. § 158(a), and Phar-Mor cross-appealed. In its opinion, the district court affirmed the bankruptcy court's decision on "post-rejection equipment lease damages," concluding that: "None of the cases cited by Giant Eagle [] demonstrate that Phar-Mor's lease obligations could be *revived* after they were mitigated and supplanted by the new leases with Snyder." The district court agreed with (and quoted from) the bankruptcy court's opinion but did not cite any law or engage in any reasoning or analysis of its own.

The district court, quoting from *In re At Home Corp.*, 392 F.3d 1064, 1068 (9th Cir. 2004) (explaining the requirement as applied to § 365(d)(3), which covers leases of real property), also affirmed the bankruptcy court's decision on "pre-rejection administrative rent," holding that 11 U.S.C. § 365(d)(5) "makes clear that the debtor must perform all obligations owing under a lease — particularly the obligation to pay rent at the contract rate — until the lease is rejected." And, citing *In re Elder Beerman*, 201 B.R. 759, 763 (S.D. Ohio 1996), the court reasoned that, pursuant to § 365(d)(5), "it is the debtor who must persuade the court, based on the equities of the case, that such rent should not be paid or should be reduced by some amount," and the bankruptcy court was not persuaded. The district court found no basis upon which to disagree with the bankruptcy court.

## II.

"We review the bankruptcy court's decision directly, according no deference to the district court. The bankruptcy court's findings of fact are reviewed for clear error, and questions of law are reviewed *de novo*." *In re S. Air Transp., Inc.*, 511 F.3d 526, 530 (6th Cir. 2007) (citation omitted). This case presents a question of law or an application of the law to the given circumstances, and the bankruptcy court's factual findings are immaterial to the disposition of this appeal.

Giant Eagle argues that it is entitled to damages resulting from Phar-Mor's rejection of the lease, and therefore, that it should be deemed a general unsecured creditor for purposes of Phar-Mor's bankruptcy distribution.  *See* 11 U.S.C. § 365(g)(1).  Phar-Mor replies that when a lessor, confronted with a lessee's breach of a lease, enters into a subsequent binding lease with a third party and the benefit of that lease would fully mitigate any damage from the prior breach, then the prior lessee is excused from liability as of the date of the new lease, as if the prior lease never existed, was assumed, or was extinguished by novation.  The bankruptcy court agreed with Phar-Mor, and the district court agreed with the bankruptcy court.  We do not agree, and instead find for Giant Eagle.

**A.**

Subject to the court's approval, a bankruptcy trustee may "reject" an unexpired lease, 11 U.S.C. § 365(a), and proceed as if the debtor had breached the lease immediately before the petition date, § 365(g), thereby prompting the lessor to file a proof of claim to recover damages, § 501(d). Such a claim is expressly allowable: "A claim arising from the rejection, under section 365 of this title . . . , of an . . . unexpired lease . . . shall be determined, and shall be allowed . . . the same as if such claim had arisen before the date of the filing of the petition," § 502(g)(1).  But, even though this provision allows the claim conceptually, the trustee may still object to the amount:

> A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

> [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]

§ 502(a) & (b)(1) (paragraph break omitted).  Thus, the question remains as to how to properly quantify such a claim — first "as of the date of the filing of the petition" (i.e., benefit of the lease bargain), and then, "except to the extent that such claim is unenforceable against the debtor" (i.e., actual damages).  For these calculations, we look to state law (and the lease), to the extent that it does not conflict with the bankruptcy code.  *Butner*, 440 U.S. at 55.

In this case, the leases contained two important features:  (1) a liquidated damages provision that quantified the benefit of the bargain as the present value of all future monthly payments, based on a seven percent (7%) discount rate; and (2) an express choice-of-law provision, designating Pennsylvania law as controlling.  Pennsylvania statute provides four possible alternatives for calculating damages:  (1) "[d]ispose of the goods and recover damages (§ 2A527)"; (2) "retain the goods and recover damages (§ 2A528)"; (3) "in a proper case recover rent (§ 2A529)"; or (4) "[e]xercise any other rights or pursue any other remedies provided in the lease contract" (e.g., seek liquidated damages).  13 Pa. C.S.A. § 2A523(a)(5) & (6) (citation form altered).  Here, because of the inclusion of the liquidated damages provision — which has not been contested, *see* § 2A504(a) — we begin and end with the fourth alternative.  *See also* § 2A527(b) ("Except as otherwise provided with respect to damages liquidated in the lease agreement . . . ."); § 2A528(a) ("Except as otherwise provided with respect to damages liquidated in the lease agreement . . . ."); § 2A529(a) (making this provision applicable only under particular circumstances that are not present here).

Pennsylvania common law dictates that the lessor has a duty to mitigate the damages and cannot claim damages that could have been avoided.  *See In re Paskorz*, 284 B.R. 429, 431-32

(Bankr. W.D. Pa. 2002).  Before imposing this duty to mitigate, however, we must consider whether this Pennsylvania law conflicts with the bankruptcy code.  *See Butner*, 440 U.S. at 55.

In the bankruptcy case of *In re Steiner*, 50 B.R. 181, 183 (Bankr. N.D. Ohio 1985), a lessor sought damages in the form of future rents from a bankrupt debtor's rejection of a farm equipment lease.  The court framed the question as "whether or not the language of 11 U.S.C. § 502(b) is intended to allow a lessor to claim the actual amount of rent which would have been paid under the contract, or whether the lessor is entitled to claim only the actual damages which result from the rejection."  *Id*. at 184-85.  The court reasoned that "[i]f a lessor were able to recover the actual amount of rent due under the lease as well as having the property available to it for re-rental, the lessor would receive twice the benefit it had originally contracted for over the same period of time," and concluded that the Bankruptcy Code did not intend such a result.  *Id*. at 185.  Consequently, the court held that the lessor was entitled to claim only actual damages, meaning that it was subject to Ohio's duty to mitigate.  *Id*.  The same reasoning applies to the present case.[9]

---

[9]As an aside, because *Steiner* is perhaps the solitary case on this issue (and certainly the case most closely analogous to the present case), it bears mention that, in the end, the *Steiner* court limited the damages calculation in the manner prescribed by § 502(b)(6), based on the court's assertion that "[u]nder this section [§ 502(b)(6)], a claim arising from the rejection of an unexpired lease of *personal property* is limited in the same manner as is a claim for the rejection of an unexpired lease of *real estate*."  *Steiner*, 50 B.R. at 183 (emphasis added) (citing *In re Allied Tech., Inc.*, 25 B.R. 484 (Bankr. S.D. Ohio 1982)).  That assessment is incorrect.  *See*, *e.g.*, *In re Vause*, 72 B.R. 647, 650 (Bankr. S.D. Ohio 1987), *overruled on other grounds*, 886 F.2d 794, 796 (6th Cir. 1989) ("Although *In re Steiner* [] relates to a lease providing for annual rental payments, the property leased was personalty which this Court believes is not within the scope of the explicit limitation in § 502(b)(6).").  First, *Allied Tech* does not stand for such a proposition; at most, it alludes to such a proposition, and even that is far from clear.  Nor does any other case support such a proposition, quite probably because it defies the plain language of the statute, which says "if such claim is the claim of a lessor for damages resulting from the termination of a lease of *real property* . . . ."  *See* § 502(b)(6) (emphasis added).  If Congress had intended to include personal property within the ambit of this provision, it certainly could have done so expressly, rather than leaving it to a court to conclude that an express statement of "real property" actually means both real and personal property.  Finally, there is good reason to conclude that Congress intended to apply this limit to real property but *not* personal property.  In the statutory notes to the 1978 enactment, the drafters explain:

> [Section (b)(6)], derived from current law, limits the damages allowable to a landlord of the debtor.  The history of this provision is set out at length in *Oldden v. Tonto Realty Co.*, 143 F.2d 916 (2d Cir. 1944).  It is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate.

11 U.S.C.A. § 502(b)(6) ("Revision Notes and Legislative Reports," 1978 Acts).  In discussing (and reconciling) the tension between landlord and debtor — and the inconsistent, back-and-forth treatment the law has given this issue over time — the cited case points to a fundamental premise:

> In truth, the landlord is not in the same position as other general creditors, and there is no very compelling reason why he should be treated on a par with them.  For, after all, he has been compensated up until the date of the bankruptcy petition, he regains his original assets upon bankruptcy, and the unexpired term in no way really benefits the assets of the bankrupt's estate.

*Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 920 (2d Cir. 1944) (footnote and citations omitted).  And § 502(b)(6)'s Revision Note furthers this premise with the following:

> [I]n a true lease of real property, the lessor retains all risk and benefits as to the value of the real estate at the termination of the lease.  Historically, it was, therefore, considered equitable to limit the claims of a real estate lessor.

11 U.S.C.A. § 502(b)(6) (Revision Notes).  Therefore, it would be unreasonable to apply § 502(b)(6) — which is predicated on the expectation that the landlord will retain the real property at the end of the lease term, and that property, being land, will either retain its value or actually appreciate in value — to leases of personal property, which depreciate in value, often to the point of zero value.  Such is the present case, in which the parties anticipated and determined the monthly lease payments on the belief that the warehouse equipment would have an end-of-term or salvage value of zero.

Therefore, the proper approach to resolving this objection was to first calculate the benefit of the bargain "as of the date of the filing of the petition," *see* 502(b)(1), and, from there, determine "actual damages" based on (Pennsylvania) state law, by reducing the benefit-of-the-bargain calculation by the amount actually or reasonably mitigated. As it turns out, the amount actually mitigated in this case is also the amount reasonably mitigated because, after Snyder's one-year lease and ensuing insolvency and bankruptcy liquidation, the only possible (further) mitigation was the re-use and salvage sale option actually undertaken. Under the above-described approach — and the stipulated facts — Giant Eagle is entitled to have its claims allowed, and it should be deemed a general unsecured creditor in the additional amounts of $1,454,780.90 and $58,143.02.

**1.**

The bankruptcy court predicted four dire consequences from "allow[ing] the subsequent breach of a mitigating lease to revive a debtor's obligations under the original lease." Notwithstanding the fact that this "revival" perspective is entirely backwards— and requires the assumption, without basis, that the original lessee's obligations were terminated or extinguished — none of these proposed calamitous consequences is even legitimate, let alone persuasive.

First, the bankruptcy court proposed that it would create uncertainty by forcing the breaching lessee to "wait anxiously" for the duration of its (rejected) lease term, because it would owe damages at some unknown (and unpredictable) time in the future, if the mitigating lease subsequently failed. While this may be an excellent argument for shortening the length of the statute of limitations, it is thus an argument for the (Pennsylvania) state legislature, not a court. We are not concerned with — nor do we have any power to affect — what the statute of limitations *should* be, we are only concerned with what it actually is, and in this case it is four years. *See* 13 Pa. C.S.A. § 2725(a); *Cucchi v. Rollins Prot. Servs. Co.*, 574 A.2d 565, 568 (Pa. 1990) (holding that, although § 2725(a) says "contract for sale," it also applies to leases); *see also* 42 Pa. C.S.A. § 5525(a)(1).

Phar-Mor breached the lease on either September 30, 2002 ("actually," i.e., the rejection date), or September 23, 2001 ("effectively," as the rejection of the lease was deemed to have occurred on the day before the bankruptcy petition date), and Giant Eagle filed its claim on September 26, 2002. This is well within the four-year statute of limitations. To the extent that the bankruptcy rules affect the timeliness of the claim, the parties stipulated that Giant Eagle had timely filed its proof of claim. Certainly, neither the claim nor the objection to it had actually been decided when Giant Eagle clarified for the court that the subsequent (Snyder) lease had been breached, that it could not re-let the equipment, that it had mitigated to the best of its ability by reusing some and selling the rest, and that is was pursuing its claim for lost future rents — that is the very essence of this dispute. Even if the claim or objection had been decided, however, and new circumstances (such as an after-occurring lease or after-occurring breach) had motivated either Giant Eagle or Phar-Mor to adjust its claim, the bankruptcy statute specifically allows for this, providing that: "A claim that has been allowed or disallowed may be reconsidered for cause." 11 U.S.C. § 502(j).

Next, the bankruptcy court posited that granting a lessor's claim in these circumstances would force the lessor to sue the original breaching lessee, even after mitigating, in order to protect itself against the specter of a failed mitigating lease and the expiration of the statute of limitations governing the original breach of lease. Once again, this is an excellent argument against the statute of limitations, this time in favor of extending it, and once again, it is irrelevant to this decision.

The court also proposed that granting a lessor's claim in these circumstances would render the breaching lessee a guarantor of, or co-debtor with, the subsequent mitigating lessee. This is simply incorrect. Phar-Mor rejected (i.e., breached) the lease — at that point, Phar-Mor was liable for the damages resulting from such a breach. The fact that Giant Eagle partially mitigated, or attempted to mitigate, those damages did not render Phar-Mor any less liable; it simply reduced the

amount of money Phar-Mor would have to pay in order to put Giant Eagle back in the position that it would have been in if not for the breach. All that happened here was that Giant Eagle partially mitigated the damages it suffered, to the benefit of Phar-Mor, which — despite remaining just as liable — was thereafter obligated to pay a lesser amount to make Giant Eagle whole.

This argument might have some legitimacy under entirely different circumstances: If Phar-Mor, rather than Giant Eagle, had approached Snyder; *and* if, rather than breaching the lease, Phar-Mor had assigned the lease to Snyder; *and* if Snyder, rather than entering a new and unrelated lease with Giant Eagle, had assumed Phar-Mor's lease; *then* Phar-Mor might have a legitimate argument that it was being forced to act as a guarantor or co-debtor. But none of these things happened.

Finally, the bankruptcy court proposed that granting a lessor's claim in these circumstances would put the lessor in a better position than it would be under the original lease, by allowing it to recover from both the original breaching lessee and subsequent (mitigatory) breaching lessee. But, the mere fact that a plaintiff has obtained some partial mitigation of a legitimate claim against a liable defendant — and now seeks only to recover the rest of that claim (i.e., to be made whole) — does not put that plaintiff in a better position that it would have been under the original claim by allowing the plaintiff to recover from two liable parties rather than one. *See*, *e.g.*, *In re Braude Jewelry Corp.*, 333 B.R. 156, 160 (Bankr. N.D. Ill. 2005). Pursuant to the original leases and Phar-Mor's breaches, Giant Eagle was damaged in the amount of $2,901,472.90 — Giant Eagle cannot recover any more than that, regardless of how many parties it seeks recovery from, and is in no better position by mitigating than it would have been otherwise. That is the very essence of mitigation.

**2.**

Phar-Mor argues that the bankruptcy court must determine the claim at the time of the breach, so it must also determine mitigation at the time of the breach, and since there would be no mitigation at that point, the court must rely on only the "reasonable hypothetical re-let value" or "assumed re-let value" and ignore actual values, or else "[j]udicial finality could never occur." But, in this case, Phar-Mor continues, the bankruptcy court "was in the unique position to have an actual re-let value, occurring almost immediately after rejection, with which to assist it in factually assessing this mitigating credit." Thus, Phar-Mor insists that the bankruptcy court must ignore the truth and render a decision based on expectations that could have existed at some random point in the past and refuse to let the parties adjust for actual subsequent events. We think not.

Phar-Mor also contends that granting a lessor's claim in these circumstances is demonstrably improper because the lessor in this case, Giant Eagle, has not "provided . . . the Snyder's bankruptcy estate such a credit," based on Giant Eagle's claim against Phar-Mor. Even ignoring the fact that Snyder's bankruptcy is no business of Phar-Mor's, this whole contention is baseless. The Snyder lease was a subsequent lease, intended from the outset to mitigate Phar-Mor's breach — there is no basis for reducing Snyder's claims because of a recovery from Phar-Mor, inasmuch as the Phar-Mor lease was not intended to mitigate a breach by Snyder.

Phar-Mor cites *In re American HomePatient, Inc.*, 414 F.3d 614, 618-19 (6th Cir. 2005), a case concerning the rejection of an executory contract, for the proposition that damages must be determined as of the time of the breach, i.e., immediately prior to the date of filing the petition. That case, which says nothing about *mitigation of damages*, is completely inapposite. Applying the facts of the present case to the *American HomePatient* holding results in the unremarkable, and undisputed, finding that Giant Eagle's future rent damages — at the date of the petition — were $2,686,919.04 (i.e., $2,580,642.60 + $106,276.44, in expectation damages). The fact that these damages, as calculated at the date of the petition, could have been, should have been, and were mitigated subsequently, is neither addressed nor affected by *American HomePatient*'s holding.

Phar-Mor also cites *Dennis v. Morgan*, 732 N.E.2d 391, 391 (Ohio 2000), an Ohio Supreme Court case, for the proposition that a lessee is only obligated to pay rent for so long as the property remains un-rented — actually calling this case "[p]erhaps the best summary of the nature and extent of liability of a lessor upon a lease which has been breached." But, an Ohio Supreme Court decision deciding the meaning of an Ohio statute (O.R.C. § 1923.04) and its effect on a lease for real property, has little if any bearing on the present case. This is not persuasive.

Finally, Phar-Mor contends that Giant Eagle should "suffer the consequences of [its] mitigation efforts with Snyders [sic],"and expresses outrage that Giant Eagle would even argue that it should not have to "suffer" such consequences. It is difficult to do much with this contention, other than express dismay. Let us be very clear: there is no proposition in law or equity that an injured party who attempts to mitigate the damage that results from another party's misconduct must "suffer the consequences" of its attempting to mitigate.

In conclusion, we hold that the district court erred by disallowing a lessor's legitimate claim for future-rent damages arising from a lessee's rejection of a lease, on the basis that a substitute lease for that property, *if fulfilled*, would have mitigated the claimed damages.

**B.**

In its cross-appeal, Phar-Mor denies that it owes any rent from July 18, 2002, until September 30, 2002, because, Phar-Mor contends, during that time period, Giant Eagle benefitted from the use of the leased equipment and, per 11 U.S.C. § 365(d)(5), the court may deny such payment "based on the equities of the case." Giant Eagle responds that, until Phar-Mor rejected the lease, it was obligated to pay rent as promised and § 365(d)(5) is not contrary. The bankruptcy court and the district court found no inequity and instead agreed with Giant Eagle.

The plain language of 11 U.S.C. § 365(d)(5) requires the debtor (Phar-Mor) to pay rent until the time the lease is actually rejected, which, in this case, was September 30, 2002. There is no basis upon which to conclude that the bankruptcy court abused its discretion by ordering Phar-Mor to fulfill its obligations "based on the equities of the case," inasmuch as Phar-Mor indisputably benefitted, at least a little, from the use of the equipment during this time.

**III.**

For the foregoing reasons, we find that the bankruptcy court and district court erred by disallowing Giant Eagle's claims for future rent damages, and we **REVERSE**. We **REMAND** to the district court for purposes of further remanding to the bankruptcy court for further proceedings consistent with this opinion. We **AFFIRM** the bankruptcy court and the district court, however, with respect to the claims for administrative expenses in the form of post-petition rent payments, from the date of Phar-Mor's filing of the petition to the date of its rejection of the lease.