**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1242n.06

**No. 12-5358**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Nov 30, 2012*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| In re: THIRTEENTH FLOOR ENTERTAINMENT CENTER, LLC, | ) ) ) | |
| Debtor | ) ) | |
| _____ | ) ) | |
| THIRTEENTH FLOOR ENTERTAINMENT CENTER, LLC, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| Appellant, | ) ) | |
| v. | ) ) | |
| LOUISVILLE GALLERIA, LLC, | ) ) | |
| Appellee. | ) | |

Before:  SUTTON and STRANCH, Circuit Judges; STEEH, District Judge.[*]

SUTTON, Circuit Judge.  Premier Health and Fitness Clubs signed a lease with Louisville Galleria to open a gym in downtown Louisville, Kentucky.  Problems arose, and the gym never opened.  Premier filed for bankruptcy instead.  Premier sued Galleria for breach of contract, and Galleria counterclaimed for unpaid rent.  The bankruptcy court entered judgment for Galleria, and the district court agreed.  We affirm.

---

[*]The Honorable George C. Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

I.

Premier's business partners operate a number of fitness centers in and around Kentucky, and they wanted to open another one in Louisville in Galleria's new "Fourth Street Live!" development. Premier and Galleria entered into a 41-page lease for space on the second floor of the Kaufman-Straus Building on November 24, 2003.

The lease set a number of deadlines. It gave Premier 90 days from the date of the lease (until February 24, 2004) to design and deliver layout plans. It provided that Galleria would prepare the space for Premier, and it listed a number of items for Galleria to complete. It said that, once Galleria "substantially completed" those items and once Premier could "begin its work without material interference," Lease (R.5-3) § 201(l), Galleria would deliver a "notice of possession" to Premier, *id.* § 316. And it said that, at that point, Premier would have 30 days to prepare a "punchlist" of problems still needing repair by Galleria, *id.* § 401, and a 180-day "fixturing period" to outfit the gym would begin, *id.* §§ 201(m), 307. After the fixturing period, Premier would open the gym, and its obligation to pay rent would start.

To deliver possession, Galleria also had to provide air conditioning:

Landlord will supply chilled water to the Premises via a central plant or, at Landlord's option, Landlord shall provide HVAC rooftop units with adequate tonnage capacity for Tenant's use as determined by certified mechanical engineers. Tenant will be responsible for all distribution and for modifying the air distribution equipment in the space as required to meet its needs.

*Id.* Ex. C ¶ 10. The clause permits two cooling methods. One is a preexisting "chilled water" system, which uses an underground condensing unit and has eight-inch lines running from the unit to each tenant space in the development. The other involves "HVAC rooftop units," which circulate chilled glycol, would sit on the roof of the facility and would serve only Premier. In either case, the units would feed chilled liquid into "air handling units" in Premier's space. The air handling units would then cool the air by circulating it past the chilled liquid. At the time the parties signed the lease, the preexisting chilled water system was hooked up to the space, but Premier had concerns about its adequacy.

Premier had other concerns. It wanted more space in particular. Galleria had placed corridors in the premises to accommodate an adjacent food court, lowering Premier's total square footage. Premier claimed this was a surprise. While Galleria had e-mailed a diagram of the space showing the corridors to Premier before Premier signed the lease, Premier said it had trouble opening the document. And while the parties attached the diagram to the lease as Exhibit A, they attached it after Premier signed the deal. Premier and Galleria in any event began negotiating a lease amendment for additional space. (They settled on a section of the third floor, and in August 2004 signed a written amendment, although it never became effective.)

Galleria delivered possession on January 31, 2004. In response, Premier did not prepare a punchlist or send any notice disputing possession.

Premier missed its first deadline—the February 24 deadline to deliver plans—and Galleria sent Premier a written notice of default on March 3. Premier responded in an e-mail, blaming the delay on its architect's ignorance of structural poles that interfered with the placement of group fitness rooms. Six days later, Premier signed an "estoppel certificate," stating that Galleria had delivered the space as obliged and that Premier had accepted delivery. App'x at 259.

Galleria decided to install new rooftop HVAC units on or about April 1. Premier finished its design and hired engineers on April 8 to prepare construction plans. Galleria sent another notice of default to Premier on April 15, again complaining about the lack of plans (among other issues), and Premier again responded by e-mail, providing updates on its progress. Around this time, Premier began construction. Premier completed its construction plans on June 25 and delivered them to Galleria on July 8. Galleria demolished the existing ductwork for the chilled water system in July or August and began installing the rooftop HVAC units around September 2.

Under the lease, Premier should have opened and begun paying rent on July 29. Neither happened, and Galleria sent another notice of default on August 2. This time, Premier responded on August 23 with a notice of default of its own, the first such notice it sent to Galleria. Premier complained about the corridors, the structural poles, negotiations over additional space and other issues, such as unfinished flooring. Galleria sent new notices of default on August 31 and September 8.

Premier filed for Chapter 11 reorganization on October 4 and converted the filing to a Chapter 7 liquidation on November 8. Galleria sent a notice of termination on October 6. The trustee declined to assume the lease on December 4. Galleria filed proof of claims. Acting on behalf of the trustee, Premier sued Galleria, alleging various breaches of the lease. Galleria counterclaimed. After a five-day bench trial, the bankruptcy court ruled for Galleria. The bankruptcy court considered the lease fully integrated, determined that Premier breached the lease and awarded damages totaling $1,269,739.80, which included unpaid rent dating from July 29, money spent by Galleria to discharge mechanics' and materialmen's liens and attorney's fees. The district court affirmed, and Premier appeals.

II.

The lower courts held that Premier breached the lease by failing to pay rent. Giving that legal conclusion a fresh look, as we must, *Giant Eagle, Inc. v. Phar-Mor, Inc.*, 528 F.3d 455, 461 (6th Cir. 2008), we agree. The terms of the lease permit no other conclusion. Under the lease, Premier's rent obligation began 180 days after Galleria delivered possession. Galleria turned over possession on January 30, triggering Premier's duty to start paying on July 29. Premier never paid the rent, and that amounted to a breach under the lease. At one level, it is as simple as that.

Not so, Premier says: Galleria never delivered possession because it switched air conditioning systems. The answer to this point is not as simple, but it does not alter our conclusion either.

Exhibit C of the lease required Galleria to "supply chilled water to the Premises via a central plant or, at Landlord's option, Landlord shall provide HVAC rooftop units with adequate tonnage capacity." Premier agrees the chilled water system was in place on January 30. But it argues that Galleria's decision to install the second system retroactively voided the notice of possession and the deadlines that went with it. Section 201(l) of the lease required Galleria to "substantially complete[]" its work before delivering possession so that Premier could "begin its work without material interference." Installing rooftop units materially interfered with Premier's work, it says, because Premier needed to redesign its construction plans to accommodate the new system.

This argument has a few problems. The first is that Premier never raised any concerns with Galleria about switching to the new system. Only after the parties' relationship soured did Premier voice this complaint, making it untimely. *See* Restatement (Second) of Property: Landlord and Tenant § 7.1 cmt. d ("The tenant may hold the landlord in default . . . only if the tenant has requested the landlord to perform."); *cf. IBM v. Omnicare, Inc.*, 162 F. App'x 432, 438 (6th Cir. 2006) (finding waiver of breach of contract claim when defendant with knowledge of the alleged breach continued performing and did not claim breach until sued). There of course is an explanation for Premier's decision not to complain: It wanted better air conditioning, a not-insignificant consideration for a fitness center. Nor at any rate was this (beneficial) change the primary cause of any delay in Premier's construction planning. *See* Bankr. R. 70 at 189–90, 219–20 (blaming negotiations for more space for delay); App'x at 126 (noting that plans had to be redone once first floor became unavailable).

Premier also did not give Galleria written notice of this issue during the lease. Section 2705 of the lease requires "[a]ll notices, demands and requests" by the parties to be made "in writing." If Premier thought the switch to the new air conditioning system would slow things down, Premier should have sent a letter to Galleria asking for more time. And if Premier wanted to dispute the notice of possession after the switch, it should have done so in writing, as the lease required. There is nothing unusual about entering a lease or other contract that requires written notice of problems. *See Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 313 (6th Cir. 2010); *HDRE Bus. Partners Ltd. Group, L.L.C. v. Rare Hospitality Int'l*, No. 11-30970, 2012 U.S. App. LEXIS 15710, at *11 (5th Cir. July 30, 2012) (enforcing notice of breach and cure provision in commercial lease); *Matrix Group Limited, Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 589 (8th Cir. 2007); Ky. Rev. Stat. § 383.625(1) (mandating "written notice to the landlord" when a purported breach of residential lease occurs).

Trying to avoid this requirement, Premier insists that the clause requires notice only of *breaches*, and that Galleria's failed delivery of possession did not breach the lease because Galleria could have delivered the premises later. But the clause is not limited to breaches; it covers "[a]ll notices, demands and requests." If Premier thought something had occurred to make the notice of possession ineffective, the lease required it to inform Galleria in writing.

Even if Premier had given notice, that still leaves another problem unanswered. Premier acknowledges that the chilled water system was in place when Galleria delivered possession. Premier Br. at 9. While Premier may not have liked that system, *see* App'x at 88, 141–42, Premier

cannot deny that the lease permitted it. That presumably is why Premier does not argue that the initial notice of possession was defective, and indeed has expressly disclaimed any such argument. Premier's position, then, necessarily comes to this: when Galleria decided to add a better air conditioning system, it retroactively nullified its notice of possession. That, however, provides no answer to the reality that Galleria could satisfy its obligations under the lease with *either* system. Galleria's decision to give Premier a benefit it need not provide did not reset the clock, even if Premier wanted to change its plans as a result. If adapting to the new system somehow caused new problems, Premier should have declined or written a letter asking for more time. It did neither.

Premier also claims that the bankruptcy court should have considered parol evidence in evaluating the lease. But "[w]hen the negotiations are completed by the execution of the contract, the transaction, so far as it rests on the contract, is merged in the writing." *Radioshack Corp. v. Comsmart, Inc.*, 222 S.W.3d 256, 260 (Ky. Ct. App. 2007). This lease, which featured an integration clause, § 3401, is complete, integrated and unambiguous, *see Kovacs v. Freeman*, 957 S.W.2d 251, 257 (Ky. 1997); *Frear v. P.T.A. Indus.*, 103 S.W.3d 99, 106 (Ky. 2003), making resort to parol evidence unnecessary and impermissible. Courts in this setting, it is true, nonetheless may look to parol evidence to resolve claims of fraud, mutual mistake or illegality. *Childers & Venters, Inc. v. Sowards*, 460 S.W.2d 343, 345 (Ky. 1970). But Premier makes no such allegations.

Citing unpublished Kentucky cases, Premier adds that it had the right to offer evidence to rebut a presumption that the lease was integrated. *Classic Truss Wood Components, Inc. v. Landis Lakes Patio Homes, LLC*, No. 2005-CA-002604-MR, 2007 WL 866459, at *4 (Ky. Ct. App. Mar.

23, 2007); *Keith v. Robinson*, No. 2005-CA-001260-MR, 2006 WL 3524056, at *2 (Ky. Ct. App. Dec. 8, 2006). Even if these cases accurately reflect Kentucky law, the bankruptcy court *did* hold a hearing. Bankr. R.69 at 3–116. And the only evidence Premier wants to introduce is a statement by Galleria's representative, Blake Cordish, that Galleria would deliver the space as a "warm, dark, white box." Premier Br. at 20. It is unclear what bearing, if any, this evidence has on whether Galleria was obliged to install rooftop units. The bankruptcy court permissibly ignored it.

III.

For these reasons, we affirm.